1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION

3  SHARON GLASSBROOK,           Case No. 13-CV-10152
                                U.S. Magistrate Judge
4       Plaintiff,              Michael J. Hluchaniuk
                                Flint, Michigan
5          v                   October 15, 2014
                                9:02 a.m.
6  ROSE ACCEPTANCE, INC., et al,

7       Defendants.
   _____/
8
   Ordered By:                  THOMAS SCHEHR, ESQ.
9
                        MOTION HEARING
10
   APPEARANCES:
11
   For the Plaintiff:           DAVID HONIGMAN, ESQ. (P33146)
12 (By Phone):                  Maltese, Honigman, Rossman &
                                Williamson, P.C.
13                              1361 East Big Beaver Road
                                Troy, MI  48083
14                              248-457-9200

15 For the Defendants:          THOMAS SCHEHR, ESQ. (P54391)
                                Dykema, Gossett
16                              400 Renaissance Center
                                Detroit, MI 48243
17                              313-568-6800

18 Court Recorder:              Tammy Hallwood

19 Transcriber:                 Deborah Kremlick

20

21

22

23 Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
24

25

```
 1        (Court in Session)

 2        THE CLERK:  All rise.  The United States District

 3  Court for the Eastern District of Michigan is now in session.

 4  The Honorable Michael Hluchaniuk, United States Magistrate

 5  Judge presiding.

 6        THE COURT:  You may be seated.

 7        THE COURT:  Hello.

 8        MR. HONIGMAN:  Hello, Your Honor, it's Dave

 9  Honigman.

10        THE COURT:  Good morning, Mr. Honigman.

11        MR. HONIGMAN:  Good morning.

12        THE COURT:  We're here in Court today and we will

13  call the case and then I'll ask for the appearances of

14  counsel.

15        THE CLERK:  The Court will now hear civil case

16  number 13-CV-10152, Sharon Glassbrook versus Rose Acceptance,

17  Incorporated, et al.

18        THE COURT:  Could I please have the appearances of

19  counsel for our record this morning first for the plaintiff.

20        MR. HONIGMAN:  This is Dave Honigman, Your Honor, on

21  behalf of the plaintiff.

22        THE COURT:  All right.  And for the defendant.

23        MR. SCHEHR:  Good morning, Your Honor.  Thomas

24  Schehr on behalf of the defendants.  And with me today are

25  Brian Titus and Allen -- excuse me, Adam Holland from FNBA.
```

1           THE COURT:  All right.  Good morning again to all of

2    you.  We are here to take up a hearing on two motions that are

3    pending before us this morning.  Those being docket number 77

4    which is the defendants' motion for summary judgment, and

5    docket number 83 which is the plaintiff's motion to amend.

6           The -- I think it's probably best just to reflect on the

7    record today that plaintiff's counsel, Mr. Honigman is not

8    present in the courtroom, he is on the phone at his request.

9    This matter had been scheduled for a personal appearance and

10   Mr. Honigman has requested that he be allowed to participate

11   by phone.  It's perfectly acceptable and that's certainly

12   taking place today.

13          So let's start with the defendants' motion for summary

14   judgment.  And Mr. Schehr if you're ready you may proceed with

15   your argument.

16          MR. SCHEHR:  Thank you, Your Honor.  Should I go to

17   the podium?

18          THE COURT:  Yes, please.

19          MR. SCHEHR:  Thank you.

20          THE COURT:  I take it, Mr. Honigman, that you're

21   able to hear us all right?

22          MR. HONIGMAN:  I am.  I can hear everything fine

23   thanks, Your Honor.

24          THE COURT:  Good.

25          MR. SCHEHR:  Your Honor, summary judgment in favor

1  of the defendants is appropriate because there's no genuine

2  issue of material fact over whether the defendants called the

3  plaintiff's SafeLink phone utilizing the TouchStar dialer.

4       And the question before the Court today is whether the

5  plaintiff has satisfied her burden under Rule 56 of

6  establishing a genuine issue for trial.  I would ask the Court

7  to view the record through the lens set forth by Rule 56.

8       So let's take a look at the record, Your Honor.  The

9  defendants utilized three methods for calling during the

10  relevant time frame.  The first is manual dialing, the second

11  is click to dial, and the third is the TouchStar dialer.

12       Neither manual dialing nor click to dial are alleged to

13  be an automatic telephone dialing system within the meaning of

14  the Telephone Consumer Protection Act.  Nor are manual dialing

15  or click to dial alleged to employ a pre-recorded message.

16       The question before the Court is whether or not plaintiff

17  was called utilizing the TouchStar dialer.  The TouchStar

18  dialer is the only thing that is alleged to be an ATDS under

19  the statute.  We certainly dispute that that is the case.

20  That if the TouchStar dialer did not call the plaintiff and

21  that's not an issue that the Court needs to address.

22       In addition the TouchStar dialer is the only technology

23  employed by defendants that is capable of utilizing a

24  pre-recorded message.  So again the question before the Court

25  is whether the TouchStar dialer was used to call plaintiff's

1  SafeLink phone.

2      Your Honor, we have filed a detailed motion for summary

3  judgment.  I don't intend to take the Court all the way back

4  through it, but I do want to highlight two exhibits that I

5  think are very important and frankly dispositive of the issue.

6      The first -- the first is Exhibit L to our motion for

7  summary judgment.  This is the call log showing all calls from

8  defendants to the SafeLink phone owned by the plaintiff.

9      The record is undisputed that TouchStar is plugged into a

10  specific port on FNBA's phone system and it's known as a TS

11  line.  And it's undisputed that if TouchStar was used then

12  under the collector column on Exhibit L there would be a

13  notation TS.  This is the universe of calls to the SafeLink

14  phone and I can represent to the Court that there is not one

15  TS designation under the collector column which means that

16  TouchStar did not call the plaintiff.

17          THE COURT:  These are your records -- your client's

18  records?

19          MR. SCHEHR:  These are the defendants' records

20  showing the universe of calls made to the plaintiff's SafeLink

21  phone, yes, Your Honor.

22          THE COURT: Okay.

23          MR. SCHEHR:  The second exhibit that I'd like to

24  direct the Court's attention to is Exhibit J.  This is a

25  declaration of Craig Bowman who is the head of IT of the

1   defendants.  And specifically I'd like to direct the Court's

2   attention to Exhibit 1 to Mr. Bowman's declaration.

3          THE COURT:  Unfortunately my computer doesn't seem

4   to be working right this morning so I'm not able to access

5   those.  If you can give me just a second, Mr. Schehr, I

6   apologize.  I'm going to try to reboot and see if that will --

7   why don't you go ahead with your argument, Mr. Schehr.  I'll

8   just have to make do.  Exhibit J.

9          MR. SCHEHR:  Exhibit J and specifically Exhibit 1 to

10  Exhibit J is a query of the TouchStar dialer.  TouchStar only

11  works, Your Honor, when phone numbers are uploaded to it.  And

12  TouchStar keeps track of every phone number that has ever been

13  called.  And there hasn't been any number that's been deleted

14  from TouchStar.

15     We ran a query of the TouchStar data base.  This Exhibit

16  1 is the result of that query.  And had the 1158 number, the

17  SafeLink number that's the subject of this case been called by

18  TouchStar, then there would have been a result yielded on this

19  query.

20     Your Honor, you can see that there are no results under

21  any of the columns and as such the TouchStar dialer was not

22  used to call plaintiff's SafeLink phone.  No results, the

23  number was never in TouchStar and TouchStar never called the

24  plaintiff's SafeLink phone.

25          THE COURT:  Mr. Schehr, does that seem unusual to

1   you?  That this is a means through which contact with people

2   who -- who your client's business would normally contact, this

3   is a device that would be normally used, but yet this

4   particular phone was not called by -- by this system which

5   apparently is used on a regular basis by your client.  How

6   would you explain the absence of contact with that number?

7           MR. SCHEHR:  It's not unusual in the least, Your

8   Honor.  The client has a detailed system for maintaining phone

9   records and only numbers that are eligible to be called by the

10   dialer are input into the dialer.

11       So cell phone numbers are not placed into the dialer

12   unless there is consent to call that cell phone number.  So it

13   is not unusual at all that a cell phone number is not placed

14   into the dialer.

15           THE COURT:  In all instances is it readily known

16   that a -- a particular number is a cell phone number versus a

17   land line number?  I mean if -- if the number came to the

18   attention of your client in the normal course of business and

19   there was an attempt to contact somebody who owed a debt,

20   would they be able to recognize just by looking at the number

21   that this was a cell phone versus a land line?

22           MR. SCHEHR:  Not necessarily, Your Honor, no.  And

23   that number would never have been put into the dialer.  The

24   client has a process for uploading information into the

25   dialer.  There is a separate query that is done and only

1  numbers that are eligible -- that the client has designated as

2  eligible to be called by the dialer, i.e. a land line, or a

3  cell phone, where the borrower has given consent are placed

4  into the dialer.

5          THE COURT:  But I guess my question is, if -- if

6  somebody who was uploading numbers into the system for

7  purposes of contacting someone, was simply provided with a

8  phone number however that number may have been acquired, would

9  it be obvious from the -- the appearance of the number that it

10  was a cell phone number?  Could someone have done this by

11  accident?

12          MR. SCHEHR:  The answer to the question is, Your

13  Honor, no, it is not obvious from a telephone number in and of

14  itself whether or not it is a cell phone number.  And what I'm

15  saying is, that as a result that number never would have been

16  uploaded into the dialer because only numbers that are

17  eligible to be called by the dialer are uploaded into the

18  dialer.

19          THE COURT:  But any land line would be eligible,

20  right?

21          MR. SCHEHR:  I -- I believe that is a fair

22  statement, Your Honor.

23          THE COURT:  And therefore if someone perhaps by

24  mistake believed that a number was a land line versus a cell

25  phone number could not that person have uploaded this number

1   into the system?

2           MR. SCHEHR:  Not here, Your Honor because we've

3   queried the dialer and the dialer has never made a call to the

4   number at issue.  So while it's hypothetically possible, that

5   there's human error at some point, I suppose that's possible

6   in any case.

7       In this particular case with Sharon Glassbrook, it is

8   technologically impossible for her to have received a call

9   from the TouchStar dialer.  Our phone records establish that

10  and the query of the dialer establishes that.

11          THE COURT:  Okay.

12          MR. SCHEHR:  And there's no evidence to the

13  contrary, Your Honor.

14          THE COURT:  Okay.  I understand your argument.

15          MR. SCHEHR:  Okay.  We produced five witnesses to

16  testify about these records that I've just showed to the

17  Court.  All have confirmed through their testimony what I have

18  explained to the Court.  We've produced additional records all

19  of which supports the proposition, the undisputed fact, that

20  the TouchStar dialer was to used to call Mrs. Glassbrook.

21      Plaintiff argued vigorously, Your Honor, at the

22  scheduling conference back on March 10th that they wanted a

23  right to inspect our system.  Your Honor may recall that the

24  plaintiff has said the defendants' phone records would

25  establish whether or not she has a claim under the TCPA.  And

1    quite frankly we agree with that.

2        We -- the -- the Court in the scheduling order allowed

3    the plaintiff the right to come in and inspect our system and

4    the plaintiff did not avail themselves of that right.  Had

5    they done so, they would have simply confirmed what we have

6    offered to the Court which is a query of the dialer which

7    shows that the SafeLink phone was never called by the dialer.

8        Your Honor, all of that is undisputed.  That's an

9    important point to know.  While it's hypothetically possible

10   that a human error was made at some point and somebody could

11   have received a call on their cell phone by the dialer without

12   their consent is not the issue before the Court.

13       The issue before the Court is whether Sharon Glassbrook

14   was called by the dialer.  And under Rule 56 she has a burden

15   in responding to a summary judgment motion.  The Masushita

16   case from the United States Supreme Court I think is

17   instructive on her burden.

18       That specific case says that she has an obligation to

19   come forth with more than a scintilla of evidence.  She's got

20   to show more than a metaphysical doubt as to the records

21   offered by the defendant.

22       And that case also says, "if the factual context renders

23   the plaintiff's claim implausible, then the plaintiff must

24   come forward with more persuasive evidence to support her

25   claim than would otherwise be necessary".

1        So she has a burden of coming forward with evidence to

2   show that there is a genuine issue for trial.  So let's look

3   at what she has come up with in response to our motion for

4   summary judgment to determine whether she's met a burden.

5        The first Your Honor, is vague testimony she's offered

6   that essentially repeats the allegations in the complaint.

7   She's confirmed she has no documents relating to any of those

8   calls.  She says SafeLink doesn't maintain any records

9   containing those calls.  She doesn't recall any specific

10  calls.  She doesn't know when the calls were made.  Her

11  testimony is very vague about having received a pre-recorded

12  message from the defendants.

13          THE COURT:  She -- she does seem, and I'll ask you

14  this, whether you accept the notion that she seems confident

15  that such calls were made, although she can't identify the

16  specific dates, times that they were made on.  Would you agree

17  with that?

18          MR. SCHEHR:  Well, she -- she does state that she

19  received a pre-recorded message, I believe that's Your Honor's

20  question.  But let's -- let's take a look at the testimony

21  that she has on what pre-recorded message she claims to have

22  received.

23        What she claims is that she would pick up the phone,

24  there would be a pause, and that she would hear please hold

25  for an important message from First National Bank.  And then

1   there would be a pause for seven or eight minutes until a

2   credit service rep from First National Bank actually came on

3   the line and that would eat up her scarce minutes on her

4   SafeLink phone program.

5       That's the gist of the complaint.  Please hold for an

6   important message.  Then she has to wait and that ate up her

7   minutes.

8       Now we've established and the record is undisputed that

9   our system is technologically incapable of doing that.  The

10  only time the TouchStar dialer can employ a pre-recorded

11  message is on voice mail.  There is a voice mail prompt, you

12  hear a beep, or you hear an answering machine beep.  Then and

13  only then when the dialer was turned on to leave a

14  pre-recorded message, would there be a pre-recorded message.

15      That pre-recorded message has been produced to the

16  plaintiff and it's also been transcribed for the Court.  And

17  it's a very basic message.  It just says, this is so and so

18  from First National Bank, please call me at the following

19  number and that's it.

20      It never said, please hold for an important message and

21  then would wait until a credit service rep was available to

22  take the call.  Moreover, Your Honor, if there was a call by

23  the dialer and a credit service rep was unavailable,

24  technology would simply drop the call.  If there was no credit

25  service rep ready to talk to the borrower when she picked up

1    the phone, the call would be dropped.

2        We do not have the technology, it was not employed to say

3    on a pre-recorded message, please hold for an important

4    message from FNBA while the borrower waited for a credit

5    service rep to be available.

6            THE COURT:  Okay.

7            MR. SCHEHR:  Okay.  And, Your Honor, I think there's

8    been a general recognition throughout this case by counsel to

9    the plaintiff that a simple recitation of what's in the

10   complaint by the plaintiff in an affidavit or in -- in

11   deposition testimony is insufficient to get the case to trial.

12       And what I want to focus the Court's attention on is the

13   fact that Mr. Honigman and Mr. Campbell have said all along

14   that the defendants' records would establish whether the

15   dialer called the plaintiff.  The defendants' records

16   establish that the dialer did not call the plaintiff and as a

17   result there was not enough to overcome summary judgment under

18   Rule 56.  So the vague testimony by itself about any support

19   in the documents or the records is insufficient to withstand

20   summary judgment.

21       Let's look at what else the defendants have offered --

22   I'm sorry, the plaintiff has offered to withstand summary

23   judgment.  The first is a 56 affidavit, Rule 56 affidavit

24   that's been signed by Mr. Honigman.

25       I read that as an addition that on the record as it

1  stands that there is no basis to oppose summary judgment under

2  Rule 56.  What Mr. Honigman asks for is a continuance of

3  discovery to try to find some additional records that

4  theoretically could cast doubt on the undisputed record that

5  we have before the Court.

6      Your Honor, it is not clear why whatever discovery that

7  they seek now was not conducted during the discovery period.

8  In the very first requests for documents and interrogatories

9  that we received from the plaintiff, we were asked to identify

10 our service providers, telephone service providers.  We did so

11 in a timely fashion.  That was disclosed clearly and

12 unambiguously.

13     I believe the response date was April 7th.  We produced

14 that information.  The plaintiffs waited about a month, I

15 believe they served their subpoenas on May 6th or May 7th to the

16 telephone service providers.

17     But in any event they did do that.  Whether or not they

18 followed up is not clear to us.  We have no information from

19 the telephone service providers that the plaintiff obtained in

20 response to the subpoena other than some AT&T records which

21 they gave us at the close of discovery.

22     But it's clear that if the plaintiff wanted information

23 they had the ability to do that through the subpoena yet

24 didn't follow up.  We had a motion to compel hearing before

25 Your Honor on June 25th of 2014.  There was no request to

1  extend discovery during that motion hearing or as part of

2  their motion to compel.

3      The only time we are now hearing of a request to extend

4  discovery is after they read our dispositive motion.  Well, we

5  laid out, the records are undisputed, that she was not called

6  by the TouchStar dialer.

7      The Court has discretion in terms of what to do with the

8  56 affidavit.  We laid out the factors that the 6th Circuit

9  asked the Court to consider in our brief and I'm not going to

10  through those once again unless the Court has questions.  But

11  the bottom line is they had the opportunity to do whatever

12  discovery they wanted during the discovery period, they did

13  not do so.  They did not ask for a continuance of discovery

14  during the discovery period.  And it is inappropriate to ask

15  for a continuance of discovery after the close of discovery

16  and after we filed a dispositive motion laying out what we've

17  said from day one of this case which is she was not called by

18  the TouchStar dialer.

19          THE COURT:  All right.

20          MR. SCHEHR:  And then the last thing that they

21  offered in an effort to respond to our motion for summary

22  judgment is the Renshaws.  Now I know adding them is the

23  subject of a separate motion and we can deal with that

24  separately.

25      But I think it's important to note a couple things.

1    Number one, the Renshaws do not corroborate Sharon

2    Glassbrook's testimony.  They've never met Sharon Glassbrook,

3    they know nothing about any calls that were made to her.  They

4    have no records relating to any calls made to Sharon

5    Glassbrook.  Whether the Renshaws had their own claim will

6    rise or fall on its own merit.  It has nothing to do with

7    Sharon Glassbrook's claim or lack thereof.

8        Second, it appears from a review of the briefing both on

9    the motion for summary judgment and on the motion for leave to

10   amend, that the Renshaws are being added here, or they want to

11   add them in an effort simply to conduct more discovery.

12       I direct the Court's attention to the reply brief that

13   the plaintiff filed in support of their motion for leave to

14   amend Page 2 in which they state that the Magistrate didn't

15   issue an order granting in part and denying in part

16   plaintiff's motion to compel the production of critical

17   documents that might make the Renshaws' participation less

18   necessary until June 25th.

19       And then they say they contacted us about whether we'd

20   produce documents after the close of discovery.  And we said

21   we've produced everything we have.  And then they say in their

22   brief at the bottom of Page 2, it was at that point that the

23   balance tipped decisively in favor of adding the Renshaws even

24   though that would probably mean another expensive heavily

25   contested motion, briefing, and hearing.

1     So the Renshaws are being sought -- they're seeking to

2   add the Renshaws to the Glassbrook case in an effort simply to

3   conduct more discovery.  The Renshaws' claims have nothing to

4   do with Sharon Glassbrook's claim and we would ask the Court

5   to decide Sharon Glassbrook's claim on its own merit as

6   opposed to anything that the Renshaws may have to say about

7   calls that they received from FNBA.

8          THE COURT:  It -- it would be fair to say, would it

9   not, Mr. Schehr, that at face value anyway the Renshaws

10   provided information that was similar to Ms. Glassbrook, that

11   is that they alleged that there was automatic dialers,

12   messages left, those kinds of things, which are generally

13   consistent with the description that Ms. Glassbrook gave about

14   those events?

15          MR. SCHEHR:  I -- I don't think that's accurate,

16   Your Honor.  Pre-recorded -- I guess it's fair to say that

17   they allege they received a pre-recorded message and if Your

18   Honor doesn't consider anything other than that, then yes,

19   that is similar.

20     But if you take even more than a superficial look at what

21   they said, you will realize that the pre-recorded message that

22   they say they received is markedly different than what Sharon

23   Glassbrook says she received.  They say they picked up the

24   phone and they said -- and FNBA said, please hold for an

25   important message.  Press 1 if you are the borrower, press 2

1   if you are not the borrower which is a completely separate and

2   distinct set of facts relating to a pre-recorded message that

3   Sharon Glassbrook said -- never said existed.

4        There was no press 1 or press 2 that Sharon Glassbrook

5   offered as part of the pre-recorded message.  So they're

6   claiming something completely different.

7             THE COURT:  Right, the wording was different, but --

8             MR. SCHEHR:  Our system is technologically incapable

9   of doing that and we'll deal with that when the Renshaws file

10  their own complaint.  But the bottom line is, their message

11  doesn't really mesh with Sharon Glassbrook's message, it's

12  completely different.

13            THE COURT:  Okay.

14            MR. SCHEHR:  Okay.

15            THE COURT:  I think I understand.

16            MR. SCHEHR:  Okay.  So the Court should consider the

17  burden that the plaintiff has in an effort to respond to a

18  summary judgment motion.

19       We've cited the cases from the Eastern District of

20  Michigan, Miller, Toma, and Pugliese.  And we think that the

21  Courts in those cases are -- have rendered decisions that are

22  really instructive here.

23       The Courts in those cases say there needs to be more than

24  self serving affidavit or testimony in an effort to respond to

25  undisputed records offered by the defendants relating to calls

1    that were alleged to have been made.  And the Courts in each

2    of those cases granted summary judgment because there was

3    nothing more than vague statement about calls being made.

4           THE COURT:  But at least in -- in some of those

5    cases and maybe I'm thinking about Pugliese that some of the

6    documents that were presented in favor of the -- the motion

7    were -- were not the parties' documents, were they not?  They

8    were actually phone records or the plaintiff's own documents?

9    And is -- is that a distinguishing factor here in your view?

10          MR. SCHEHR:  Your Honor, I don't -- was not counsel

11   of record in that case.  I don't know anything about the case

12   other than what the Court said in its -- in its opinion.

13          THE COURT:  And I don't either.  I'm just relying on

14   what it said in the opinion.  But it seemed to me that -- that

15   at least in the Pugliese case that there was the -- the

16   concept that some of the records that the -- that the

17   plaintiff was using were inconsistent with plaintiff's records

18   and they were -- I'm -- I'm sorry, the plaintiff's records or

19   records that they were relying on were inconsistent with the

20   statements that the plaintiff gave.

21      And so the Court based its decision in terms of the

22   overall evidence that was presented in -- in support of the

23   motion and in response to the motion, that they weren't

24   relying solely on the defendant's records to establish the --

25   the factual basis of the decision.

1     And so -- so there wasn't this -- this concept that it's

2  your records that form the basis as opposed to a non-party

3  like the phone company or something of that nature to -- to

4  the extent that might be a distinguishing factor.

5           MR. SCHEHR:  Well, I -- I don't think it is, Your

6  Honor.  Again, there is a burden that the plaintiff has after

7  having an opportunity for discovery to come forth with

8  specific evidence.

9     There is nothing here that I've seen.  They have some

10  phone records from AT&T.  I'm not sure what the import of them

11  is.  It doesn't establish at all that the dialer was utilized

12  to call Mrs. Glassbrook whatsoever.  But they've had the

13  opportunity to -- to issue subpoenas and in fact have issued

14  subpoenas to the phone companies in an effort to get the

15  records.  Apparently there's nothing in those records that

16  would support their claim because Mr. Honigman otherwise would

17  not have filed his Rule 56 affidavit.

18     The other thing I want to point out and -- and perhaps

19  this is -- this is important in light of the Court's

20  questions, these call detail records, whatever the definition

21  of -- of those is, Mr. Honigman has made a big deal about the

22  fact that we haven't identified what phone numbers we used to

23  call the plaintiff.

24     The fact of the matter is in any given month there is

25  only one phone number that is used by the defendants to call

 1  anybody regardless of which telephone dialing method is used.

 2  So the phone records are not going to show anything because

 3  there is a specific number that was utilized to call the

 4  plaintiff.  That's undisputed, Your Honor.

 5          THE COURT:  Was it the same throughout this period

 6  of time, or did it vary from month to month?

 7          MR. SCHEHR:  Was what, the phone number?

 8          THE COURT:  Right.  I mean I thought you said in any

 9  given month there was only one number.  Does that suggest that

10  it --

11          MR. SCHEHR:  That's --

12          THE COURT:  -- varies -- that number varies from

13  month to month or --

14          MR. SCHEHR:  I believe the number could vary.  I

15  don't know that we had any control over it.  Bottom line is

16  that in any given month this is a declaration that's

17  undisputed in the record.  In any given month there was simply

18  one number that was ascribed by the phone company to any

19  outgoing calls made by the defendants.  And as a result any

20  phone records are not going to establish whether or not the

21  TouchStar dialer was utilized to call plaintiff.

22          THE COURT:  Telephone company records.

23          MR. SCHEHR:  Correct.

24          THE COURT:  Okay.  All right.  I'll give you an

25  opportunity for rebuttal after Mr. Honigman has completed his

1   comments.

2           MR. SCHEHR:  Thank you, Your Honor.

3           THE COURT:  Mr. Honigman.

4           MR. HONIGMAN:  Thank you, Your Honor.  Well, it's --

5   it's our view of course that there is a genuine dispute of

6   material fact about whether or not the defendants called or

7   attempted to call and send text messages to any of plaintiff's

8   cell phone numbers using an automatic telephone dialing system

9   and pre-recorded messages without her consent.

10      We believe that you should deny defendants' motion for

11  summary judgment since all the material facts are

12  substantially disputed based on the testimony and documents

13  that have already been produced and order defendants to

14  produce the outgoing calling records defendants used to

15  attempt to contact plaintiff, especially defendants' calling

16  numbers and call detail records.

17      Now part of the problem here is -- is labeling.  The

18  defendants keep stating that they have produced the "call

19  detail records".  But what they're calling call detail records

20  are missing -- they've deleted the most important information

21  which is what time -- well, call detail records at a minimum

22  normally provides the telephone number of the calling party,

23  the telephone number of the called party, the date of the

24  call, the time of the call, and the duration of the call.

25      The records defendants produced did not include records

1  of the time of the calls, the time the calls were made, and

2  their duration, or the number they used to call -- to call

3  from.  So without that, that's -- without that we can't tell

4  anything from the records and the defendants know that.

5      Our expert's unrebutted testimony as you can see from his

6  affidavit says, that we need all that information to see if --

7  or at least that would be -- that may -- there's a -- there's

8  a excellent chance that if they disclose that information that

9  will reveal conclusively -- it could reveal conclusively that

10  an ATBS was used.

11      Let me give you an example.  This is an easy one.  Let's

12  say the records indicate that the bank made 60 phone calls to

13  Mrs. Glassbrook in 60 seconds.  Obviously no human could do

14  that.  But they've deleted the time they made the phone calls

15  from the records that they produced, so we can't tell that.

16      That exclusion itself is revealing.  Why would they

17  delete it unless it would show something unfavorable to them?

18  Let me get back on track here a little.

19      I -- I don't want to go into all the detail -- all the

20  facts again in the brief, but Mrs. Glassbrook had 250 free

21  calling minutes a month on her SafeLink phone.  In the event

22  that plaintiff exceeded 250 minutes in usage in any particular

23  month she would purchase a phone card.

24      So keeping that usage under 250 minutes a month was very

25  vital to the plaintiff because if she spent more than that

1   allotment, that means she had to spend cash that she needed

2   for other parts of her family budget and, you know, she's a

3   person of modest means and has two kids to support.

4        Plaintiff testified that when she received calls from the

5   bank, she would sometimes she recalls clicking noises then

6   also sometimes hear a pre-recorded message stating, please

7   hold for an important message from the bank.

8        She testified that she would hold the line and wait while

9   her scarce minutes expired.  She further testified that the

10  bank left illegal pre-recorded messages on her -- on her voice

11  mail.

12            THE COURT:  So, Mr. Honigman, do you allege that

13  that introductory comment, please hold for an important

14  message, is that a pre-recorded message that violates the law

15  in your opinion?

16            MR. HONIGMAN:  It does, Your Honor, yes.  The TCPA

17  says that you cannot use pre-recorded messages unless you have

18  the consent of the called party even if an auto dialer isn't

19  used.

20       Now of course it's hard to understand how or why a

21  company would use a pre-recorded message in the absence of an

22  auto dialer.  Our expert has testified that he's never heard

23  of such a instance.

24       Why would somebody from the bank manually dial the phone

25  number and then when he heard Mrs. Glassbrook pick up the line

1  all of a sudden put on a pre-recorded message.  Now of course

2  he'd speak himself he wouldn't manually dial and leave a

3  pre-recorded message.

4      So the fact that pre-recorded messages were heard by Mrs.

5  Glassbrook and by the Renshaws also reveals that an auto

6  dialer was used.

7          THE COURT:  Did the Renshaws say that such a message

8  was -- was part of the call that was made by the defendant to

9  them?

10          MR. HONIGMAN:  Yes.  Yes, they testified that they

11  received pre-recorded messages and had to wait on the line.

12          THE COURT:  Yeah, but the specific message -- the

13  specific message of please hold while a representative comes

14  available or words to that effect.

15          MR. HONIGMAN:  They didn't use those exact words,

16  but words to that effect.  They said that someone came -- and

17  that a recording had them wait and -- for someone to come on.

18  But they didn't use those exact identical words, but words to

19  that effect.

20          THE COURT:  And the fact that the --

21          THE COURT:  And that's very similar by the way to

22  the actual recording produced by the bank.

23          THE COURT:  You believe that's similar to the

24  recording produced by the bank?

25          MR. HONIGMAN:  Similar not -- not identical, but

 1  similar.

 2          THE COURT:  Well, but -- but the -- the -- as I

 3  would understand it, the -- the pre-recorded message that

 4  you're describing now would be at the front end of the

 5  conversation.

 6          MR. HONIGMAN:  Yes.

 7          THE COURT:  Where it would -- there would be an

 8  automatic dialer used arguably and once the phone was

 9  answered, the pre-recorded message would kick in and -- and

10  request that the -- the person called stand by basically while

11  the actual live person recognizes that somebody has answered

12  the phone and then -- and then connects to that person and

13  then contacts them for whatever purpose was associated with

14  the call.

15      Whereas it seems to me what the -- what the defendants

16  here have produced is a message that would be left on an

17  answering machine.  And I believe that the defendants assert

18  that the only message that they would have left would be one

19  left when the tone from an answering machine became apparent.

20      So that the -- the message is only left when -- when

21  nobody answers the phone.  And then it's -- it says this is

22  somebody from the -- the defendant and please call this number

23  or -- or words to that effect.  So they're not really all that

24  similar, are they in terms of what the defendant says their

25  message was versus what you allege was used in this instance?

1      MR. HONIGMAN:  No, I thought there was one that said

2  to wait.  But -- but of course even if the one they produced

3  isn't the same, that doesn't mean that that's what happened.

4      We have three people who testify otherwise.  Three out of

5  three I would -- would add or 100% of the persons we've been

6  able to identify who received phone calls from the defendant.

7           THE COURT:  All right.

8           MR. HONIGMAN:  You know, the -- the factual disputes

9  at the heart of this lawsuit haven't really changed since day

10  one.  Based on detailed personal observation, plaintiff filed

11  a complaint alleging that the defendant bank and its employees

12  violated the TCPA by calling her cell phone using a -- a robo

13  calling system and pre-recorded messages.  And from day one

14  the bank and its employees have disputed both the assertions

15  and that factual dispute remains with us today.

16           THE COURT:  Right.  And -- and the -- the -- when

17  you drill down here, the -- the question before us in this

18  motion is in light of the factual assertions that the

19  defendant has made that no robo dialing equipment was ever

20  used to call the SafeLink phone of the plaintiff and -- and

21  therefore there was no automatic dialing system used with

22  respect to any communication to your client and that's the

23  only system that the defendant maintained through which a

24  pre-recorded message could be left.

25      Their records show that no such calls were ever made

1  during this period of time to the SafeLink phone.  And -- and

2  your response, which is the responding party in a summary

3  judgment motion has to come forward with evidence that is -- a

4  jury can reasonably find in her favor showing that that's

5  contrary to what the defendant has asserted.  And do you

6  believe you've done that?

7          MR. HONIGMAN:  Oh, definitely, yeah.

8          THE COURT:  Okay.  And so outline for me what the

9  evidence is that you think meets that burden.

10         MR. HONIGMAN:  Okay.  Well, before I do that I would

11  like to attack the defendants' evidence which they say are

12  their records but what we've asked -- that's just -- what

13  they're really giving us is what they claim are their records.

14  That's why we don't want to go to physically inspect the phone

15  or the dialing equipment, that has no value.

16     We want to -- we offered this at the beginning and the

17  defendants refused.  We want our expert to either be able to

18  direct somebody else, or to personally go and I don't think

19  you have to be physically present for this.  I think it can be

20  done electronically over the internet.

21     But if it has to be done in person, fine.  But I'm quite

22  sure it doesn't.  To query their system to get the records we

23  want, not the records that they -- they -- they created in

24  response to our request.

25     They keep complaining about the fact that you know, we

1    didn't go and inspect it.  Number one, how do we know that

2    they even used the TouchStar system.  That's another issue.

3         It's not undisputed that they used the TouchStar system,

4    that's their claim.  They could have -- they could have used

5    any other automatic telephone dialing system.

6              THE COURT:  Well, but --

7              MR. HONIGMAN:  All the calls --

8              THE COURT:  -- but is there -- is there any evidence

9    that they didn't use that system?  I mean --

10             MR. HONIGMAN:  Oh, yes, there is.  Let's put it this

11   way.  If they claim that TouchStar -- that if -- if we really

12   -- if our expert could query TouchStar, which he has not been

13   allowed to do, and pull records out of the TouchStar system

14   that revealed that TouchStar was not used to call Mrs.

15   Glassbrook and the Renshaws, yes, we would still have their

16   testimony that they received calls that sounded like and had

17   all the characteristics of auto dialing and that they heard

18   pre-recorded messages.

19        That would suggest that they either -- the bank either

20   had another automatic telephone dialing systems which was not

21   uncommon several years ago or they still have it and they're

22   just not revealing it.

23        With the phone records our expert should be able to tell

24   that as a matter of fact.  If we could only get these records,

25   it -- it could well resolve everything.

1          THE COURT:  And the records that you want, aren't

2   those records from the phone companies?

3          MR. HONIGMAN:  They could come from the -- the -- I

4   prefer to get them from phone company if we could only get one

5   sent, but it would be better to get the records from whatever

6   automatic telephone dialing system the defendants will admit

7   they have and compare those to the records from the phone

8   company.

9      We can't get the records from the phone company without

10  knowing what numbers they dialed out on and here's why.  Even

11  if we know all of the phone companies they employ, which we

12  don't know, we only know a couple of them, this is a huge

13  multi-billion dollar bank.

14     We need to know what lines they used to call delinquent

15  customers on.  How are we going to -- how are we going to be

16  able to tell what are the appropriate calls without knowing

17  what phone numbers they used.  It would be an enormous -- it

18  would be like finding a needle in a haystack according to our

19  expert.

20     And again that testimony of our expert is uncontradicted.

21  I don't understand what's so hard of giving us the phone

22  numbers they called out on.  That would solve so many

23  problems.

24          THE COURT:  That sort of raises the question which

25  is I think part of the -- the motion here.  And that is

1   whether the defendant somehow failed to comply with the

2   previous order that I had entered requiring that they produce

3   information.

4        And -- and I've given some thought to that and I -- I've

5   -- I guess I've come to the conclusion and perhaps I missed

6   the point in the previous hearing, motion to compel, but I was

7   under the impression that what you needed from them were the

8   numbers that they called in an attempt to contact the

9   plaintiff, not the numbers they called from.

10       Because I thought that you had said that you would be

11  able to figure that out by issuing subpoenas to the phone

12  companies.  And then you would be able to get that

13  information.  That -- that certainly was my impression.

14       And again maybe I missed the point.  But that was just to

15  clarify this issue.  I -- I really don't think -- as long as

16  the defendants produced the information associated with any of

17  the phone numbers they called in an attempt to reach the

18  plaintiff and the dates and times of those calls, then I think

19  they've satisfied that quest.

20       Because I was certainly left with the impression that you

21  could get the call data information from the phone company.

22  And --

23           MR. HONIGMAN:  Well, I'll take responsibility for

24  that, for misunderstanding.  I may be not being clear enough.

25  I thought based on what you said at the hearing that you had

1  -- you were ordering them to produce not only the numbers of

2  Mrs. Glassbrook that were called, but also the numbers they

3  called out on which we also need.  We need -- we need both

4  really.

5      Although, you know, we -- we presumably know Mrs.

6  Glassbrook's phone numbers.  However, there's -- there's

7  another explanation that might -- another set of facts that

8  might explain why it is that the defendants -- maybe they do

9  sincerely think that they didn't call Mrs. Grassbrook's cell

10 phone and yet Mrs. Glassbrook and the Renshaws are telling the

11 truth, that they received such phone calls.

12     In the records -- in their records they list an old phone

13 number of Mrs. Glassbrook that she had when she was married

14 previously and --

15          THE COURT:  The 33 number?

16          MR. HONIGMAN:  Yes.  Maybe they were -- maybe

17 they're -- maybe the bank's computer system was misallocating

18 the phone calls to Mrs. Glassbrook to that number or to some

19 other number.  There's no way to tell without looking at the

20 records.

21     But that would -- that's one explanation that wouldn't

22 make -- that doesn't require that someone not be telling the

23 truth here.  Maybe that's what happened.

24          THE COURT:  All right.  All right.

25          MR. HONIGMAN:  As you yourself noted, the defendants

1   kind of practice manual for their collection efforts, states

2   that their routine practice is to use robo dialing to call

3   delinquent customers from the 5th through the 60th day of

4   delinquency.

5       Why they wouldn't do that with Mrs. Glassbrook, I'm not

6   sure.  But -- but that's evidence that supports an inference

7   that they followed their routine practice in Mrs. Glassbrook's

8   case.

9       They sure made an awful lot of calls to her.  I don't

10  know, it's hard to believe that in her case they uniquely

11  failed to follow their guidelines.  That -- that doesn't make

12  sense.

13      I haven't heard any explanation about why they would --

14  would do that.  In these cases, Your Honor, all -- the

15  defendants almost always have a monopoly over the relevant

16  records and the plaintiff needs to get those.

17      Otherwise all they're going to have to rely on is their

18  experience -- their recounted experience of their phone call

19  with the wrongfully calling party.  What -- what else would

20  they have?

21          THE COURT:  So -- so what records do you believe

22  that they have that they -- you have asked for that they have

23  not produced?

24          MR. HONIGMAN:  The phone numbers they called out on

25  to Mrs. Glassbrook and other consumers.  And the time and

1    duration of those phone calls.  That's the critical

2    information that's needed for an expert to look at it and in

3    the patterns of the calls and the times and durations an

4    expert can form an opinion about whether or not an auto dialer

5    was used.

6              THE COURT:  And you've asked for that information?

7              MR. HONIGMAN:  We've been asking for that from day

8    -- day one, yes.  That is the definition of a call detail

9    record.  It's -- it's on your own phone bills, Your Honor.

10   If you look at your phone bill it will say when you made

11   the phone call and the duration of the phone call.  It's just

12   a routine record.  They are deleting that on purpose.  That

13   would normally come with the record.  There's nothing unusual

14   about that kind of information.

15        That -- that deletion itself suggests something fishy and

16   is itself an omission -- it's self evidence, I would argue.

17   We might have been able to settle this case, I don't know, I

18   believe these three people are telling the truth.

19        But if we had have gotten these records right away we

20   would either, if we saw there was no support in the records as

21   I told Tom many times and his colleagues, we would drop the

22   lawsuit ourselves probably.

23        So now it's possible that their calling records could be

24   consistent with robo calling or not robo calling.  There can

25   be a gray area.  They testified that they varied the intensity

1   of their phone calling campaigns.

2       In other words sometimes they would pick up the pace of

3   the robo calling, and sometimes they'd slow it down.  So if --

4   the really revealing data is the speed and concentration of

5   the calls in a small or large period of time.

6       Is it possible a human could do that, or does that

7   pattern of calling in certain time periods reveal that it must

8   have been an auto dialer.  But they didn't give us that

9   information.

10      We could get that from the phone company if they give us

11  their outgoing phone number so we know if they used to call

12  delinquent customers.  So we know, you know, what data to look

13  at.  Otherwise it would be (Inaudible) and we'd just be

14  guessing.

15      We might be looking at numbers they used to, you know,

16  market -- market their products or something.  And our expert

17  testified.  He's been an expert witness in about 50 cases.  He

18  has never seen these kind of records not produced in a TCPA

19  proceeding.  They're -- they're just customarily produced.

20      In some of the cases that the defendants rely on for the

21  proposition that summary judgment should be granted, in a

22  couple of the cases it didn't seem as though the plaintiffs

23  realized they needed those records and they didn't even ask

24  for them.  And if that was one of the reasons I believe that

25  they -- a couple of them, not all of them, lost on summary

1  judgment.

2      As you noted in some of the cases the plaintiff's own

3  records contradicted their -- their assertion of -- of illegal

4  phone calls.  So the Courts faulted them for not asking for

5  those records.  And apparently the cases went on for a long

6  time.  I don't know, I think one might have been a -- a pro se

7  case even, so --

8          THE COURT:  Mr. Honigman, do you believe that as the

9  record stands at this moment that the evidence supports

10  sufficiently the plaintiff's position that the jury could

11  reasonably find in the plaintiff's favor?  Or as Mr. Schehr

12  suggests, that you acknowledge by the 56(b) affidavit that you

13  don't currently have such information or evidence in the

14  record, but need whatever else is requested in the 56(b)

15  affidavit?

16          MR. HONIGMAN:  No, we don't, Your Honor.  That's,

17  you know, a standard ploy to claim and I worried about that

18  when we asked for the information that that would imply that

19  we think we need it in order to escape summary judgment.

20      We need it.  Of course it would -- we think it would help

21  our case.  And we need it to try the case.  But there's plenty

22  of evidence here, it's just one person's -- it's the bank's

23  employee's word.  And the records that they've created which

24  we have no idea if they really reflect reality.

25      And they have plenty of motive to fudge things.  Or maybe

 1  they don't understand what they're doing.  And it's a dispute

 2  between them, their word and three consumers' words.  It's up

 3  to the fact finder to decide who to believe.

 4      There's nothing inconsistent or unbelievable about what

 5  -- what the -- Mrs. Glassbrook or the Renshaws say.  It -- and

 6  that's another thing that would be useful to talk -- remember,

 7  we -- we were only -- I don't -- we wrote in the brief about

 8  why we -- how we got a hold of the Renshaws.

 9      When the defendants wouldn't give us, when it became

10  apparent they weren't going to give us the records we wanted,

11  we said well, we better, you know, let's go out and try to get

12  some corroborating evidence because this is standardized

13  dialing.  They must be doing the same thing to other people.

14      So we -- we scoured the Court records in Geneses County

15  and maybe a couple other counties, I -- I -- I'm not sure.

16  And came up with about 80 names of people who had their

17  mortgages foreclosed or had some kind of litigation with the

18  bank over their -- their mortgage payments.  And sent letters

19  to them.

20      And because these people are losing their homes, a huge

21  number of the, you know, letters came back unopened and there

22  was no forwarding address.  We -- we only received three

23  responses.

24      Of the three, one was from -- we -- when we talked to the

25  person it turned out they had a land line.  So as you noted,

1   you're allowed to call land lines.

2       And that left Mr. and Mrs. Renshaw who stated that their

3   cell phone was called.  And told us -- told us about -- had an

4   -- an experience remarkably similar to that of Mrs. -- Mrs.

5   Glassbrook.

6       So we have a three person sample and all three people

7   say, you know, basically the same thing.  I believe this -- we

8   could also go a long way towards finding out who is telling

9   the truth, or whose story is accurate.  Mistakes are being

10  made inadvertently here by sampling some more people who were

11  called.

12      It doesn't have to be everyone.  If I remember my

13  statistics right, I think you need about 30, 35 people to have

14  a statistically valid sample.  So that would be more --

15  another way to determine who's -- who's right here.

16      If -- if the same 100% percent percentage says the same

17  thing that Mr. and Mrs. Renshaw and Mrs. Glassbrook say, that

18  would be pretty conclusive that that's what happened.  It's

19  hard to believe that that many people are going to make up the

20  same story if it didn't happen.

21      But once again the defendants don't want to give us that.

22  This refusal to give stuff that's clearly probative is in

23  itself infinitely revealing I believe.

24          THE COURT:  All right.  Does that conclude your

25  comments, Mr. Honigman?

1          MR. HONIGMAN:  It does, Your Honor.  Although I -- I

2    would point out that there are cases cited in our brief where

3    it's -- it's enough that it gets by summary judgment that many

4    Courts have held that it's exactly the kind of dispute you

5    have here.  So --

6          THE COURT:  All right.  Thank you.  We're going to

7    give Mr. Schehr an opportunity for rebuttal.  And then we'll

8    ask you to argue your motion for leave to amend the complaint.

9    Mr Schehr.

10          MR. SCHEHR:  Thank you, Your Honor.  Your Honor, I

11   think Rule 56 is designed precisely for this situation.

12          I have a lot of points that I wanted to address in no

13   particular order.  The last point Mr. Honigman made was about

14   sampling people that could potentially be part of the class.

15   I think Your Honor's already decided that during the

16   scheduling conference on March 10.

17          The Court said that we're going to determine whether or

18   not Sharon Glassbrook has a claim before we decide to go

19   forward with any class discovery and we're here on Rule 56 to

20   establish that Sharon Glassbrook does not have a claim.

21          As I said before, I think the Renshaws' factual situation

22   is not relevant to what may have happened to Mrs. Glassbrook,

23   but I would point out that at Page 38 of Stephanie Renshaw's

24   deposition, there was the following colloquy.

25          Question, it would say please hold for an important

1   message from First National Bank?  Answer, yeah.  And then it

2   would say, this is a debt, trying to collect for a debt.  If

3   this is Joseph Renshaw, please press one.  If not, press two

4   to take a message.

5       Question, so what happened if you'd press one?  Answer,

6   it would take you to a live person.

7       Question, and then a live person would talk to either you

8   or your husband about trying to make your account current?

9   Answer, yes, sir.

10      Question, that was the pre-recorded message that you

11  received?  Answer, yes, sir.

12      Question, do you recall any other pre-recorded messages

13  other than that?  Answer, no, sir.

14      I would also note that the pre-recorded message is

15  alleged to have the name of the borrower in it.  I don't know

16  how it could be pre-recorded if the borrower's name was in --

17  in the message.  But in any event, that is a different

18  pre-recorded message than Sharon Glassbrook alleged, but it

19  doesn't -- I don't want that to take away from my fundamental

20  point which is what happened to the Renshaws is a separate

21  claim, it's a separate case, and it doesn't have anything to

22  do with Sharon Glassbrook.

23          THE COURT:  Well, I mean if -- if the -- if

24  everything had lined up the same, that is the Renshaws

25  testified about something that was a -- a message that was

1  virtually identical to what Mrs. Glassbrook had testified

2  about, wouldn't -- wouldn't you concede that there would be

3  some corroboration that such a message was used?

4          MR. SCHEHR:  Well, the answer is no, Your Honor.

5  The -- the fact is that the message was not used.  There's no

6  proof whatsoever from our system that this message could even

7  be used in any context.

8     Our system is technologically incapable of leaving that

9  message.  And it was available for inspection and they've

10 refused to take a look at it to see if we could do that.  And

11 now they're saying well, there's something fishy going on, or

12 there could be records out there.

13     And I heard Mr. Honigman say at one point we've refused

14 to allow their expert to inspect the system.  Nothing could be

15 farther from the truth.  It's in the Court's order that they

16 had the right to inspect the system and they -- they did not.

17 They chose not to, Your Honor, and as a result you cannot come

18 on a Rule 56 motion and say there's something fishy out there.

19 That's not sufficient to carry the burden when they had the

20 right to do that and chose not to do that.

21          THE COURT:  Okay.

22          MR. HONIGMAN:  Well, Your Honor, can I add one

23 thing?

24          THE COURT:  Not right now, Mr. Honigman.

25          MR. HONIGMAN:  Okay.

1           MR. SCHEHR:  You asked Mr. Honigman what records

2    exist that haven't been produced.  I don't know that you

3    received a clear answer to that question.  There was clearly a

4    motion to compel discovery that was filed.  We dealt with that

5    on June 25th at the hearing.  It was granted in part and denied

6    in part.

7         We produced a document that is attached as Exhibit 2 to

8    Mr. Honigman's brief which I believe complies precisely with

9    the Court's order.  Sets forth the number that was called and

10   the date and time of the phone call that was made.

11        Nothing else was requested.  On that motion to compel I'm

12   not aware of any deficient discovery response that exists on

13   this record.  Moreover I will note that during that hearing

14   the Court indicated that since we had recordings of the calls,

15   although Mr. Honigman had not asked for them, that you thought

16   it might be wise for us to produce them.

17        We did produce them to Mr. Honigman.  He has recordings

18   of all of the calls.  So to the extent he wants to know

19   information about the duration of the calls which was not the

20   subject of the motion to compel, he has the actual recordings

21   set forth.

22           THE COURT:  What -- what was deleted from those

23   records?

24           MR. SCHEHR:  There's nothing deleted.  What's

25   redacted, Your Honor, is the phone numbers.  Because those are

1   not her phone numbers.  We did -- we did not redact when it

2   was her phone number.  But the numbers where we redacted were

3   not her phone number.  And they're not alleged to have been

4   her phone number.

5       So we didn't delete anything, we just didn't disclose the

6   full phone number because she's not alleged to have had any

7   phone numbers other than those that she previously disclosed.

8   Now we're hearing about this 33 number which is one of the

9   numbers that was redacted, but that's not the same number,

10  number one.  And number two, she had that number back in 2006,

11  2007 well outside the statute of limitations.

12          THE COURT:  So -- so there are in looking at this

13  exhibit, there are -- there are what appear to be 33 numbers

14  in there, at least there's a 33 that appears at the far right

15  hand column.  And -- and that's not to Ms. Glassbrook's 33

16  number?

17          MR. SCHEHR:  Correct.  It's to a different number.

18          THE COURT:  Just coincidentally has 33 at the end?

19          MR. SCHEHR:  Coincidentally has 33 at the end.

20  Different number.  Since this is a class action we don't want

21  to encourage the plaintiffs to find additional parties, we

22  redacted the number. And again it's not alleged to have been

23  her number during the relevant time frame.

24          THE COURT:  So those numbers and it's 810-627-8848

25  that that is the -- the number that was called in an attempt

1  to reach Ms. Glassbrook?

2        MR. SCHEHR:  That was her number at one point but

3  she lost that -- that number before the December 6th, 2010 time

4  frame set forth in the Court's order.  Nevertheless we did try

5  to call it and therefore disclosed it in response to the

6  Court's order.  But she didn't own that phone number at the

7  time.  I think it's undisputed that the only phone number she

8  had during the relevant time period is 1158, SafeLink phone.

9        THE COURT:  But -- but you attempted to call that

10 number even though it was not her -- a phone number that she

11 was using?

12       MR. SCHEHR:  We didn't know that she lost the --

13       THE COURT:  Right.

14       MR. SCHEHR:  -- the right to use that number.  So

15 yes, the -- the records show that the 8848 number was called

16 during that time frame.  But since she didn't own the phone,

17 she doesn't have standing to raise any argument relating to

18 it.

19       THE COURT:  Okay.

20       MR. SCHEHR:  Okay.  So I'm not sure that there is a

21 specific document request, or interrogatory, or anything that

22 we haven't responded to based upon Mr. Honigman's -- with his

23 -- his argument.

24    I will tell you that we have no records showing the

25 number from which the call was made.  And I've got that in a

1  declaration.  Bowman, Paragraph 5, defendants have no record

2  showing the telephone number from which the call was placed.

3      And on this concept of call detail records, the Court is

4  exactly right.  That during the transcript -- during the

5  hearing on the motion to compel discovery on June 25th, the

6  transcript Page 33 states that the Court said, the call detail

7  information, Mr. Honigman says he will get from the phone

8  company.  So that's not really an issue for this.

9      THE COURT:  All right.  Does that conclude your

10  comments?  Mr. Honigman had something else to say and I'll

11  give him the opportunity to do that.  And of course I'll give

12  you the opportunity to respond to whatever he wants to say.

13      MR. SCHEHR:  I just had one or two additional

14  comments, Your Honor.  First, Mr. Honigman indicated that my

15  client is a multi-billion dollar bank.  I believe that's what

16  he said.  That's not true.

17      It's a small family owned bank with three branches based

18  in East Lansing.  This is a very significant case for them, a

19  putative class action under the Telephone Consumer Protection

20  Act which they want to have statutory damages relating to

21  calls that were frankly never made to the class

22  representative, Mrs. Glassbrook.

23      And I would ask the Court to determine as you indicated

24  on March 10 whether or not Sharon Glassbrook has a claim.  And

25  if she does not have a claim, then I would ask the Court to

1   dismiss the case on Rule 56.  We'll deal with the Renshaws

2   separately.

3       But they've had an opportunity to conduct discovery.

4   They issued subpoenas.  They took five depositions of our

5   witnesses.  They had the right to inspect our system.  We've

6   done everything we've been asked to do.  We've produced all

7   the information that's been requested.

8       Have to have more than metaphysical doubt.  There has to

9   be more than a scintilla of evidence.  There has to be more

10  than something fishy in order for a plaintiff to withstand

11  summary judgment.  The plaintiff hasn't met her burden here,

12  Your Honor.

13          THE COURT:  All right.  Now, Mr. Honigman, you

14  wanted to add something?

15          MR. HONIGMAN:  Yes.  Number one, you asked what was

16  deleted.

17      And Mr. Schehr said certain phone numbers were redacted.

18  But I'm not -- what -- what was deleted was the time of the

19  calls, and their duration, and the outgoing phone numbers the

20  calls were made on.  That's what was deleted along with some

21  redacted stuff.

22      Now Mr. Schehr claims that that 33 number is just a

23  "coincidence".  Your Honor, we're entitled to all inferences

24  in our favor for purposes of summary judgment.  So coincidence

25  is not an inference that the Court should make for purposes of

1   summary judgment anyway.  The fact finder can reach that

2   conclusion, but not a Court for purposes of summary judgment.

3        We -- we did -- we have never asked to physically inspect

4   the system.  We've said all along we do not want to physically

5   inspect it.  We want to query the system.

6        Our expert in an affidavit is again it is uncontradicted

7   states that we have -- we must query the system to get the

8   information we need.  And that the pattern of calling revealed

9   by such a query is the most probative evidence in these kind

10  of cases.

11       And there is -- there is no evidence that disputes --

12  disputes that.  That that's the most important evidence

13  typically in a case like this.

14       We have presented all the evidence that a plaintiff could

15  ever have unless the bank had produced the -- the records that

16  we requested.  Which is their own experience of the phone

17  calls.

18       So if there's a dispute and the -- the -- the defendant

19  doesn't admit that they did what the -- what the called people

20  say they heard, there's a factual dispute.  We have a bunch of

21  employees who are loyal to their bank and they're all saying

22  one thing.

23       I mean it was kind of a -- we have deposed five people

24  but the records are way more important than that.  And we do

25  have records from the bank that contradict what they say.

1  Their guide says that they call routinely from the 5th to the

2  60th day using a robo caller.

3      And there was the testimony also of -- oh, my God, my

4  mind's a blank now.  The first gentleman we deposed which --

5  I'm sorry, he was deposed in the State Court proceeding.  I

6  can't believe I can't think of his name now.

7      But he's a -- he's an employee of the bank.  A high level

8  employee.  And he -- he stated that the bank does robo call

9  its customers who are delinquent and that that's what happened

10 to Mrs. Glassbrook.  She was robo called.

11     Now he kind of came back later and tried to say he didn't

12 know, or he wasn't sure and he kind of equivocated a little

13 subsequently, but and that -- that testimony was given before

14 the bank realized that it might be liable for illegal phone

15 calls.  That was in the State Court proceeding that that

16 testimony was given in a deposition.

17     And that State Court proceeding had nothing to do with

18 illegal phone calls.  It was about Mrs. Glassbrook trying to

19 save her home from being foreclosed on and matters related to

20 that.

21     So when they did have -- when the bank employee did have

22 an incentive to misrepresent or kind of avoid saying things,

23 they said she was robo called.  That was one of the reasons we

24 filed this suit.

25         THE COURT:  Is that information in this record?

1        MR. HONIGMAN:  It is.  He was -- I can't think of --

2   Tom, maybe you can help me out.  What was that gentleman's

3   name again?

4        THE COURT:  Mr. Schehr, do you know?

5        MR. SCHEHR:  Your Honor, I believe the person Mr.

6   Honigman is referring to is Mr. Browning.

7        MR. HONIGMAN:  Yeah.  Mr. Browning, yup.

8        MR. SCHEHR:  There are -- Mr. Honigman is not even

9   close to accurately citing what Mr. Browning said.

10       Number one, that was in the State Court proceeding and

11   it's not part of this record.  Number two, he never said the

12   bank robo called anybody.  Those words have not come out of

13   his mouth.

14       MR. HONIGMAN:  No, I didn't mean those exact words.

15   He had automatically dialed using the computer something

16   equivalent to robo calling.  He did not use that word.

17       MR. SCHEHR:  Your Honor, there's -- there's no

18   dispute in this case that the TouchStar dialer was used on

19   occasion to call borrowers.  That's not the issue.  The issue

20   is whether Sharon Glassbrook received a call from TouchStar.

21       MR. HONIGMAN:  No, not from TouchStar.  From any

22   automatic telephone dialing system.

23       MR. SCHEHR:  TouchStar is the only alleged automatic

24   telephone dialing system here.

25       MR. HONIGMAN:  No, that's not the -- we allege that

1    Mrs. Glassbrook was called by an automatic telephone dialing

2    system, not by TouchStar.  The bank claims that that's the

3    only system they have.

4            THE COURT:  And -- and the evidence that you have to

5    the contrary is -- is Ms. Glassbrook's statements that she was

6    called by something which appeared to be a robo or automatic

7    dialer?

8            MR. HONIGMAN:  Yes.  And the Renshaws' statements

9    also to that effect.  And some of the records of the defendant

10   that indicate that that's what they routinely do.

11           Pattern and practice evidence is -- is powerful.  Why

12   would a company just doing routine standardized dialing depart

13   from its standard practice for purposes of summary judgment

14   we're entitled to an inference that they followed their

15   routine standard practice which comports with her reported

16   experience.

17           The only evidence contrary is really statements from the

18   bank's employees.  They're denying what we're claiming.

19   That's what this boils down to.  Their written records are

20   merely their claims reduced to writing because they created

21   those records.

22           We have no idea if those are the real records.  And for

23   purposes of summary judgment, we're entitled to all favorable

24   inferences in our favor.  And there's a lot of evidence

25   that --

 1          THE COURT:  But -- but there's a difference between

 2   drawing an inference in favor of the plaintiff and -- and

 3   simply discrediting an assertion made by an opposing party

 4   that certain facts took place.

 5      I mean it may well be that there is some bias that might

 6   be associated with those statements, but that's no real

 7   different than the bias that might be associated with the

 8   plaintiff's statements.  So I mean --

 9          MR. HONIGMAN:  True.

10          THE COURT:  You sort of have to take the facts at --

11   at face value and decide those that are presented by the --

12   the plaintiff whether they amount here to a sufficient

13   standard to satisfy the burden of proof under the summary

14   judgment standards.

15      The defendant has come forward with evidence and you may

16   -- you may argue that that's not sufficient to trigger an

17   obligation on the part of a plaintiff to -- to make a showing

18   contrary to that, but that's really the -- the nub of the --

19   the issue here.

20      So in any event we have spent some time on this this

21   morning and I -- I am afraid that I don't have the rest of the

22   day to devote to -- to the hearing.  So you'll have to

23   conclude your comments, Mr. Honigman fairly quickly and I'll

24   -- I'll give Mr. Schehr the last word and then we'll move on

25   to the motion to -- for leave to amend.  So is there anything

1   else that you would like to say on this motion, Mr. Honigman?

2          MR. HONIGMAN:  No, I think I'd just be repeating

3   myself at this point so I'll leave it at that.

4          THE COURT:  All right.  Mr. Schehr, any final words

5   that you would care to make?

6          MR. SCHEHR:  Your Honor, number one, Mr. Honigman

7   has subpoenaed TouchStar's records so he's got those as well.

8   Number two, it is not all favorable inferences.  That's not

9   the standard under Rule 56, it's reasonable inferences should

10  be made in a light favorable to the non-moving party.  It's

11  not every favorable instance, every fishy argument that could

12  be raised by plaintiff's counsel in responding to a motion for

13  summary judgment.  He's got a burden and he hasn't met it.

14  Mrs. Glassbrook's claim should be dismissed.  Thank you.

15         THE COURT:  All right.  So that concludes the

16  argument then on the motion for summary judgment.

17       Mr. Honigman, the motion for leave to amend is your

18  motion, so proceed when you're ready, please.

19         MR. HONIGMAN:  Okay.  Okay.  Well, Your Honor, we've

20  -- let me start out by saying that we warned defendants'

21  counsel at the very first status conference that plaintiff's

22  claims had been confirmed by initial recipients of illegal

23  phone calls and that plaintiff might seek to add these

24  additional recipients as plaintiffs and class representatives.

25       Initially, we were reluctant to reveal the names of the

1   additional plaintiffs because number one, we didn't want to

2   risk exposing vulnerable people of modest means to retaliation

3   by a bank holding a mortgage on their home.  And since we

4   couldn't be sure that the -- number two, we couldn't be sure

5   that the bankruptcy trustee and the Bankruptcy Court would

6   grant us permission to proceed on behalf of the bankruptcy

7   estate.

8        And number three, at the time we were expecting calling

9   records that are normally disclosed during TCPA discovery

10   might render their testimony unnecessary although not

11   unhelpful.

12        So those are the reasons we -- we held off doing it for a

13   while.  But we believe we proceeded not only reasonably and

14   fairly, but generously to our adversaries by giving them a

15   warning we weren't required to give to prevent them from being

16   surprised while at the same time protecting vulnerable

17   witnesses and potential litigants from retribution by, you

18   know, angry defendants.

19        And indeed our concerns about harassment and retribution

20   from defendants has been borne out by among other things

21   defendants' recent filing harassing Mrs. Glassbrook by seeking

22   to convert her Chapter 13 case to a Chapter 7 case.  And I

23   take it trying to recover for themselves the statutory damages

24   they may have to pay to Mrs. Glassbrook because of their own

25   wrongdoing.

1        Furthermore, the Magistrate didn't -- you -- you didn't

2   issue an order granting in part and denying in part

3   plaintiff's motion to compel the production of critical

4   documents that might make the Renshaws' participation less

5   necessary until June 25th of this year.

6        And further complicating matters as we've discussed, the

7   plaintiff and defendants interpreted that -- that order

8   differently.  In fact it wasn't clear until late July.

9        On July 16th, believing that your order compelled the

10  disclosure of documents, it might make the Renshaws'

11  participation less necessary and hoping to avoid the expense

12  of a contested motion to add the Renshaws, I -- I asked

13  defendants' counsel if they'd be producing any more documents

14  and that -- that request is attached as an exhibit to our

15  motion to amend.

16       Finally, on July 25th, defendants' counsel responded that

17  they would not be producing the "four documents" or any

18  documents for that matter.  And as -- as Tom quoted from you

19  earlier it was at that point that the balance tipped in favor

20  and the Renshaws, even though that meant more expense, it was

21  a very expensive proceeding that doesn't seem to be advancing

22  very -- very far in terms of discovering stuff.

23       Defendants themselves identify one of the reasons that

24  plaintiff didn't move to amend the -- to add the Renshaws

25  sooner because they're in bankruptcy.  And a motion to

1    authorize employment of -- of us wasn't granted until June

2    20th.

3        And we didn't really learn that the Bankruptcy Court had

4    granted that motion until sometime in July.  Defendants

5    complained that the current motion could have been brought

6    before discovery closed.  But we don't seek any additional

7    discovery as a result of adding or not adding the Renshaws.

8        We seek the same discovery whether the Renshaws are added

9    or whether the Renshaws are not added.  We have requested from

10   day one and continue to request the call detail records of

11   people called by the bank's collection department, that's

12   nothing new.

13       Defendants complained that if plaintiff is hoping to use

14   the Renshaw -- defendants complained that plaintiffs are

15   hoping to use the Renshaws as a in their words backup plan,

16   that that's misguided.  We could do that even if the Renshaws

17   are not added to this suit.

18       We don't derive any unfair, to use the defendants' words,

19   tactical advantage from adding the Renshaws to this case.  The

20   defendants characterize the addition of the Renshaws as an

21   unfair tactical benefit, but the only tactical benefit to

22   plaintiff and the class is the efficient litigation of

23   virtually identical claims in one lawsuit instead of costly

24   multiple duplicative lawsuits.

25       If defendants want to conduct additional minor discovery,

1    that does not constitute prejudice sufficient to deny the

2    motion for leave to amend.  Defendants have already deposed

3    the Renshaws precisely because we told them we would be adding

4    them, or that we might add them.  And they have not -- and we

5    might try to add them, I should say.

6        And they have not identified any substantial discovery

7    that they may need to prepare a defense to this class action.

8    Of course not because defendants control access to most of the

9    critical documents relevant to the dispositive issues in this

10   case.  Whether defendants made calls and texts to plaintiffs

11   and the Renshaws from using an automatic dialing system and

12   whether or not they left -- used artificial or pre-recorded

13   messages.

14       Of course the defendants do not want to resolve, you

15   know, any -- any issues on the merits.  They want to

16   infinitely delay determinations on the merits of the claims

17   but it would be good to move forward.

18       The -- the defendants argued at some length that our

19   motion is an improper attempt to substitute a class

20   representative before class certification.  That -- that has

21   no merit.

22       First, we're -- we're requesting an amendment to add

23   putative class representatives, not substitute class

24   representatives.  Secondly, and more importantly, Courts

25   regularly grant motions for leave to amend to add class

1  representatives.

2      I mean we have some cases cited in our brief but let me

3  just quote from the manual for complex litigation. "Later

4  replacement of a class representative may become necessary if

5  for example the representative's individual claim has been

6  mooted or otherwise significantly altered". And it goes on

7  with other reasons for doing so.

8      As to -- as described in our brief, the cases defendants

9  rely upon, are we think distinguishable and inapplicable. I

10  -- I won't go into that, but if you have any questions about

11  that, I'm glad to answer them.

12      And that's -- I think that's -- we wanted -- well, let me

13  just conclude by saying that we want to add the Renshaws

14  because -- for a couple reasons here. Number one, adding them

15  will allow Mrs. Glassbrook to share the burden with someone

16  about the -- prosecuting this action.

17      And it will protect her we hope a little bit. Because

18  the bank won't be able to focus its -- like when they -- its

19  harassing efforts on her if there's any more of it. I hope

20  not, but you know, she's in a tough spot. She's a single

21  mother with two kids who doesn't have a lot of money and the

22  defendants really scared her when they tried to convert her

23  bankruptcy proceeding to a Chapter 7 proceeding.

24      So she has three putative class representatives that that

25  gives Mrs. Glassbrook a little comfort in that the bank won't

1   be able to focus its -- its -- its activities at her.  Plus

2   the Renshaws' experience is substantially similar to

3   plaintiff's and we assume the rest of the class.

4       Their testimony will corroborate the allegations of Mrs.

5   Glassbrook.  And they can protect -- and we're trying to

6   protect the class just by providing additional class

7   representatives who can act on behalf of the class.  Those are

8   our reasons for trying to add the Renshaws.

9           THE COURT:  All right.  Thank you.  Mr. -- Mr.

10  Schehr, your response?

11          MR. SCHEHR:  Thank you, Your Honor.  Your Honor, we

12  would ask that this motion be held in abeyance pending a

13  decision on the motion for summary judgment.  If the motion

14  for summary judgment is granted, then this motion for leave to

15  amend should be denied as moot.

16      Plaintiff does not seek to clarify Mrs. Glassbrook's

17  claim, but they're rather seeking to add new parties as Mr.

18  Honigman acknowledged in his argument.  The Renshaws can file

19  their own complaint and it will rise or fall on its own merit.

20      We believe there is a tactical advantage to plaintiff's

21  decision to attempt to add the Renshaws at this point,

22  especially in light of the fact that it wasn't -- they didn't

23  seek to add them until after they responded to our motion for

24  summary judgment.

25          One, we think it's an admission that Glassbrook's claim

 1  can't withstand summary judgment.  But number two, there is an

 2  issue regarding tolling, Your Honor.  There is no reason that

 3  Sharon -- that Renshaw could not file their own complaint now.

 4  But that would start a new statute of limitations period.

 5      Sharon Glassbrook filed her complaint in January of '13.

 6  They undoubtedly seek to have the class include everybody who

 7  was called in violation of the statute back to 2009 within the

 8  four year statute of limitations.  If she didn't file her

 9  complaint until now it would be a different limitations period

10  and I will tell the Court that FNBA has changed its dialing

11  methods recently and it no longer uses the dialer.

12      So that is why they want to add Renshaw to this complaint

13  as opposed to file a new complaint.  They want to tack that to

14  January 2009 limitations period.  And we think that that is

15  procedurally improper.

16      In addition, this is a putative class action as Mr.

17  Honigman noted.  Class actions are notorious for plaintiffs

18  and their attorney's fees.  They undoubtedly would want to

19  capture attorney's fees relating to Glassbrook's claim even

20  though it's dismissed.

21      They could say well, we just substituted the class rep

22  and we're entitled to attorney's fees while we litigated the

23  Glassbrook case.  We think that that is a tactical advantage

24  that they seek to -- to take advantage of here by filing a

25  motion for leave to amend rather than simply exercising their

1    right to go down the hall and file a new complaint on behalf

2    of Renshaw.  So there clearly is a tactical advantage and

3    that's what's going on behind the scenes here.

4        In addition, Your Honor, as we pointed out in response to

5    Mr. Honigman's motion, they haven't cited any of the Federal

6    Rules of Civil Procedure that would govern this motion.  This

7    motion is governed by Rule 16.

8        Rule 16 requires that there be good cause to amend the

9    scheduling order.  We're not in a world where we're talking

10   about Rule 15.  This is Rule 16.  We had a Rule 16 conference

11   before the Court on March 10.  On March 11, the Court issued a

12   very detailed scheduling order.

13       There was no request on March 10 or at any time before

14   then to amend the pleadings.  There was nothing in the Rule

15   26(f) report about amending the pleadings.  And the pleadings

16   therefore were locked when the Court issued the scheduling

17   order on March 11th.

18       And the authority that I have for that position is a

19   published 6th Circuit case called Leary, Your Honor.  The 6th

20   Circuit precedent says that pleadings are fixed once the Court

21   issues a scheduling order and which the Court did here on

22   March 11th.

23       The Court in that case discussed at length the interplay

24   between Rule 16 and Rule 15 and held that after the Court

25   issues a scheduling order consistent with Rule 16, that Rule

1  16 good cause standard governs.

2      So let's look at Mr. Honigman's motion in light of that

3  standard.  Has he established good cause?  Well, he's known

4  about the Renshaws since October, November of 2013.  The

5  Renshaws wanted to file suit certainly by early 2014.  They

6  were not disclosed at that time and certainly did not file

7  suit at that time.

8      We went through discovery with Sharon Glassbrook.  We've

9  produced all of our records.  They've subpoenaed TouchStar,

10 they've subpoenaed phone records.  They've taken depositions

11 of our corporate representatives, depositions of our IT

12 people, and we filed a dispositive motion on July 11th laying

13 out why there was no basis for a claim brought by Mrs.

14 Glassbrook.

15     Only after they filed their response to our motion for

16 summary judgment on August 4th did they seek leave to amend on

17 August 7th.  There has been no excuse offered for that delay.

18 Near as I can tell, they apparently at one point did not want

19 to file suit on behalf of Renshaw, but have chosen to do so

20 now in an effort to get more discovery to resurrect Sharon

21 Glassbrook's claim.  I don't think that that is good cause

22 under Rule 16.

23     In addition, under Rule 16 the law is clear that

24 defendants need not show any prejudice as a result of the

25 motion for leave to amend although my client would be severely

 1   prejudiced for the reasons I talked about earlier relating to

 2   tolling and attorney's fees.

 3        Another Federal Rule of Civil Procedure that governs this

 4   motion is Rule 20.  This is a motion to add parties, this

 5   isn't a motion to add claims for Sharon Glassbrook, or clarify

 6   a claim that she had previously stated in her original

 7   complaint.

 8        What they're trying to do is add parties.  Rule 20 says

 9   that the -- the new parties have to have a claim that arises

10   out of the same transaction or occurrence.  As we said before

11   I'm not going to go through this in detail.

12        Whatever happened with the Renshaws in their phone calls

13   are separate transactions and occurrences from the calls that

14   were made to Sharon Glassbrook.  Renshaws' claim will rise or

15   fall based upon its own merit and has nothing to do with --

16   with Sharon Glassbrook.

17        Finally Judge, even if Rule 15 were to apply, and I don't

18   think that it does, the Court would go through the same

19   standard with regard to bad faith and dilatory motive that the

20   Court is familiar with.  I think I've already laid out why

21   that's the case.

22        In terms of prejudice, I've got 6th Circuit authority that

23   I've cited in my brief.  I think it's the Duggins case and

24   there are other cases that establish that after filing a

25   motion for summary judgment when your opponent comes forth

1   with a motion for leave to amend, there is really per se

2   prejudice.

3        You've gone through discovery, you've produced witnesses,

4   and as a result the Court can basically find prejudice just

5   because of the fact that they filed their motion for leave to

6   amend after discovery.

7        If the Renshaws were added to this case it would

8   undoubtedly reopen discovery.  That's the basis and motivation

9   for Mr. Honigman to add the Renshaws here.  They would

10  probably want to re-depose witnesses of FNBA who have already

11  been produced.  They'd want to subpoena additional records.

12        THE COURT:  I heard him say that there was no

13  additional discovery that he would seek beyond whatever else

14  he's currently seeking.  So that seems to be suggesting that

15  those things that you've just identified would not be things

16  that he would be asking for.  Do you think I misunderstood

17  him?

18        MR. SCHEHR:  That is not what I picked up from his

19  argument, Your Honor.  I believe that the basis and motivation

20  to add the Renshaws is to obtain more discovery.  He's saying

21  we didn't produce something.  I don't know what that is.  I

22  don't think he's identified that, but presumably whatever we

23  didn't produce he's going to want to try to obtain a

24  production of.  And I don't -- I didn't hear him waive any

25  right to depose additional witnesses of FNBA or otherwise.

1       In addition I would want to depose the Renshaws.  When I

2   deposed them we did not have their phone records and -- and

3   whatnot up front because they were not parties to the case.

4   They were simply witnesses and there was no motion for leave

5   to amend at that point.

6       And as Mr. Honigman himself has said, they hadn't decided

7   at that point whether to add them.  So we didn't go into that

8   level of detail.

9       And I guess the last point I want to make, Your Honor, is

10  -- is it fair for a plaintiff just to substitute putative

11  class representatives in seriatim.  He had one putative rep.

12  Her claim lacks merit then you can just bring in another one.

13      I think there's case law and I've cited in our brief is

14  an accurate case and other cases that establish that that's

15  not an appropriate way to proceed under the Federal Rules of

16  Civil Procedure.

17      If Renshaw has her own claim, then she can file her own

18  complaint.  He should not be allowed to substitute plaintiffs

19  in when it's determined that the original plaintiff has a

20  claim that has no merit.

21          THE COURT:  Okay.

22          MR. SCHEHR:  Okay.  Thank you, Your Honor.

23          THE COURT:  Thank you for your comments.  Mr.

24  Honigman, any reply that you'd care to make?

25          MR. HONIGMAN:  I would.  You understood me

1  correctly, Your Honor.  We do not need any additional

2  discovery because of the addition of the Renshaws beyond that

3  which we're already asking for.

4       Number two, you know, of course the defendants want --

5  they always want plaintiffs in the class action to bring

6  individual cases.  Dozens, hundreds, or thousands because they

7  can't afford to do it.  They can only gain entrance to the

8  courtroom in a class action.

9       So is there an advantage to a class of injured persons to

10  have a class action?  Yes.  But it has nothing to do with our

11  personal attorney's fees.  We're doing this on a contingency

12  fee basis.  They're -- they're not going to, you know, be --

13  be paying that.

14       And attorneys can't afford to -- to bring these kinds of

15  cases for consumers unless they aggregate the claims.  And of

16  course wrongdoing defendants like that, but -- but it's not

17  right.  That's one of the purposes of a class action, to let

18  people of modest means have a day in Court.  A day they cannot

19  afford without the aggregation of their claims with others in

20  similar circumstances.

21       The incentives are definitely different for defendants

22  and plaintiffs in a class action and for their respective

23  counsel.  Defense counsel gets paid by the hour so they can

24  stall, they can split the cases into multiple proceedings.

25  It's to their advantage to proceed inefficiently in some sense

1   anyway.

2       It's to plaintiff's advantage to proceed efficiently.

3   It's expensive to litigate.  It's risky.  It's tiring for the

4   plaintiff.  It's emotionally draining for them.  They want to

5   get things done as quickly and efficiently as possible.

6       So in those senses it is to our advantage to aggregate

7   claims, to have multiple plaintiffs assert their claims in one

8   proceeding rather than multiple separate proceedings basically

9   stating the same repetitive claim over and over again.  And

10  it's more efficient for the Court, it doesn't waste their

11  resources to -- to aggregate claims.  So that would be my

12  response to Mr. Schehr's comments.  Thank you.

13          THE COURT:  Okay.  Both motions are taken under

14  advisement.  I will not be rendering a decision today on these

15  matters.  So thank you counsel for your arguments.  I hope you

16  feel better, Mr. Honigman.

17          MR. HONIGMAN:  Thank you.

18          THE COURT:  So we'll close the record.  Thank you

19  very much and have a good day.

20          MR. SCHEHR:  Thank you, Your Honor.

21          THE CLERK:  All rise.  Court is in recess.

22       (Court Adjourned at 10:44 a.m.)

23

24

25

1

2

3

4

5

6

7   I certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11   s/Deborah L. Kremlick, CER-4872        Dated: 11-7-14

12

13

14

15

16

17

18

19

20

21

22

23

24

25